[Crim. No. 7123. Fourth Dist., Div. Two. Apr. 9, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANK JOSEPH MARDIAN, JR., Defendant and Appellant.

20

---

**COUNSEL**

Frank Joseph Mardian, Jr., in pro. per., George H. Chula and Bernard L. November for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, A. Wells Petersen and Robert M. Foster, Deputy Attorneys General, for Plaintiff and Respondent.

---

**OPINION**

**KERRIGAN, J.—**

### STATEMENT OF THE CASE

On April 4, 1973, a felony complaint was filed in the Riverside Municipal Court charging Frank Joseph Mardian, Jr. (hereinafter "defendant") and Cliff Wyatt with unauthorized possession of a controlled substance for sale (1-phenyl-1-piper-idine-cyclohexane, more commonly known as "PCP"), in violation of Health and Safety Code section 11911.[1]

On June 22 a preliminary hearing was begun, which was continued to and concluded on July 27, at which time the magistrate denied defendant's motion to suppress evidence and held him to answer for violation of Health and Safety Code section 11910 (possession of a controlled substance).

On August 1, the Riverside County District Attorney filed an information charging defendant with possession of a controlled sub-

---

[1]Defendant was allegedly in possession of PCP in January 1973. Effective October 1, 1973, Health and Safety Code sections 11910 (referred to *infra*) and 11911 were amended and renumbered sections 11377 and 11378.

stance for sale (Health & Saf. Code, § 11911). Defendant, accompanied by counsel, was arraigned, advised of his constitutional rights, and entered a plea of not guilty in the Riverside Superior Court on August 13.

On August 21, defendant noticed a motion in the superior court to remand his case back to municipal court on the ground that the magistrate had denied him a full and complete hearing on his motion to suppress evidence at the preliminary hearing. The motion to remand was denied on September 27.

In October, the date of defendant's trial was set for December 10. In November, defendant moved to set aside the information pursuant to section 995 of the Penal Code, and concurrently, to suppress particular pieces of evidence pursuant to section 1538.5 of the Penal Code. On December 7, both motions were denied, the latter "without prejudice to its being entertained by the court conducting trial in this matter." (Defendant's petition to this court for a writ of prohibition/mandate in regard to the superior court's ruling on his 995 motion was denied on December 27.)

On January 18, 1974, defendant made yet another motion to suppress "all of the evidence seized . . . pursuant to the execution of a search warrant" in this matter. (Pen. Code, § 1538.5.) A hearing was held on this motion, and on March 14 it was denied.

On April 8, defendant's jury trial commenced. On May 1, the jury returned a verdict finding the defendant guilty of violating section 11910 of the Health and Safety Code (possession of PCP, a controlled substance)—a lesser offense necessarily included within the one charged in the information. (Health & Saf. Code, § 11911, possession of a controlled substance for sale.)

The matter was referred to the probation department, and sentencing was set for May 22, 1974. On May 22, defendant's motion for new trial was denied, and he was ordered committed to the Department of Corrections (Chino) for evaluation pursuant to section 1203.03 of the Penal Code. On August 30, defendant was returned to court, probation was denied, and he was sentenced to state prison. (Pen. Code, § 1168.) Defendant's motion for bail pending resolution of this appeal was denied.

Notice of appeal was filed in this court on August 30.[2]

## FACTS

On January 26, 1973, Mrs. Barbara Bockleman, a citizen informant, telephoned the Riverside County Sheriff's office and reported that she knew of the presence of contraband in a county residence. In response to Mrs. Bockleman's call, Deputy Sheriff Gerald Driscoll contacted her at her home in Norco. Mrs. Bockleman told Driscoll that a friend of hers, Dixie Hardesty (aka Hanson)—a woman for whom her 13-year-old daughter, Connie, sometimes babysat—had informed her in mid-January that she (Dixie) had allowed her brother (Cliff Wyatt) and "Frank" (the defendant) to store a suitcase filled with narcotics and money at her home, but assured her that the suitcase had been removed. Mrs. Bockleman then told the deputy that her daughter, Connie, while babysitting at the Hardesty residence in Glen Avon the preceding day, had seen a black suitcase containing several small plastic bags filled with a white powdery substance. Mrs. Bockleman also told the officer that Connie reported that defendant "had been into the suitcase."

Following his interview with Mrs. Bockleman, Deputy Driscoll (accompanied by Detective Ludtke) went to the Hardesty residence in Glen Avon to talk with Connie Bockleman. Connie told the officers that she had seen a black suitcase hidden in a closet in a bedroom of the Hardesty house. She had observed the contents of the suitcase, and told the officers that it contained several small plastic bags packed with white powder. She further stated that Frank had come to the residence, "been in the suitcase," and had placed white powder from the suitcase into a cardboard box with which he had left. Finally, Connie said that she had asked Donny (one of Dixie's children), a seven-year-old, what was in the suitcase and that he had responded, "there's dope . . . in the suitcase."

Armed with the information furnished by the Bocklemans, Deputy Driscoll filled out an affidavit for the issuance of a search warrant for the Glen Avon residence. On the evening of January 26, Driscoll presented the affidavit to a magistrate of the Riverside Municipal Court, who reviewed and discussed it with the deputy for some 30 minutes before

---

[2]Subsequent to this appeal defendant requested the superior court to recall its original sentence of August 30 pursuant to Penal Code section 1168. The court denied defendant's motion on December 3, 1974.

issuing a search warrant at 10:40 p.m. The warrant authorized nighttime service (e.g., after 10 p.m.).[3]

Immediately upon securing the warrant Driscoll, accompanied by Detective Frank Andrews, proceeded to the Hardesty residence in Glen Avon. The officers served and executed the warrant at 11:25 p.m. Andrews discovered a black briefcase, with a combination lock, in a closet in the master bedroom of the house. The briefcase was seized along with some papers. Subsequent analysis of the four plastic bags of white powder secreted in the briefcase revealed that one of the bags (weighing 384 grams) contained PCP (a controlled substance), and that the other three bags contained thiodiphenylamine (a chemical similar to PCP, but one whose possession is not prohibited by Health & Saf. Code, §§ 11910 and 11911).[4]

Apparently Dixie and Joe Hardesty were taken into custody upon conclusion of the search, and Cliff Wyatt and the defendant were arrested sometime later.

Defendant's preliminary hearing on the charge of possession, for sale, of PCP commenced on June 22, 1973.

The People called Dixie Hardesty as a witness, but she exercised her Fifth Amendment privilege against self-incrimination and refused to testify. The preliminary hearing was then continued and in the interim Mrs. Hardesty was granted immunity. She resumed the witness stand on July 27 and delivered the following testimony: In mid-January 1973, her brother (codefendant Cliff Wyatt), accompanied by Frank (Mardian, the defendant) brought a black briefcase to her Glen Avon residence. She, on more than one occasion, had the opportunity to view the contents of the attaché case, and noted that it (at various times) contained white powder, money, and newspaper. During the two-week interim between the arrival of the briefcase at the residence and its seizure by the sheriff's deputies, defendant visited the home on a dozen occasions whereupon he went directly to the satchel's hiding place. The day Wyatt and defendant brought the briefcase to the house for safekeeping, it was secreted in a cubbyhole off a child's bedroom in the attic, but was

---

[3]The affidavit indicated that the residents of the Glen Avon home, Dixie and Joe Hardesty, would be leaving the dwelling at 6 a.m. the following morning and that this circumstance necessitated nighttime service.

[4]PCP is an animal tranquilizer which when ingested or taken intravenously by humans produces hallucinogenic effects.

subsequently moved to her bedroom closet by Wyatt. Though defendant did not accompany Wyatt when he removed the satchel from the cubbyhole he, nonetheless, on his very next visit to the Hardesty residence, went directly to its new hiding place in the master bedroom closet. (And, though defendant had been at the Hardesty home a number of times, Mrs. Hardesty testified that he had never entered the master bedroom before.)

Detectives Frank Andrews and Gerald Driscoll also testified at the hearing. Andrews related that he had found the briefcase in the bedroom closet the night the warrant was executed, and that upon finding it contained a white powdery substance, extracted a small amount of the powder and tested it with a chemical reagent to determine if it was contraband. The results of Andrews' tests led him to believe the powder was indeed contraband, and he thereupon took the briefcase into custody. Driscoll testified briefly concerning the securing of the search warrant..

Michael White, a criminalist, testified that the four bags of powder found in the briefcase were analyzed in his Riverside lab on January 30, 1973. Three of the plastic bags contained a white powder, the fourth, yellow. One of the white powders, and the yellow, were subjected to a series of chemical tests. PCP was found to be present in both powders. White testified that the chemical analysis was made on a one milligram sample of each of the powders, but that no quantitative analysis was made as to the percentage concentration of PCP that was present in the compounds,[5] though White was able to say that he doubted his chemical tests would have revealed the presence of PCP in the compounds if its percentage concentration was less than 1 percent.

Upon conclusion of the hearing, defendant was held to answer for violation of Health and Safety Code section 11910, possession of a controlled substance.

After defendant's motion to set aside the information was denied (December 7, 1973), he moved the court to suppress the evidence seized pursuant to the search warrant. A hearing on the motion was held March 14. At this hearing, Mrs. Bockleman testified regarding her report to and interview with Riverside County Sheriff's deputies. Detective Driscoll

[5]Subsequent chemical analysis was had of these two bags and only one (the off-white) was determined to contain the controlled substance PCP. Expert testimony regarding these subsequent tests was delivered at trial.

testified regarding his investigation and execution of the affidavit supporting the search warrant for the Hardesty residence. And Dixie Hardesty delivered substantially the same testimony she had at the preliminary hearing some months before.

In addition, Connie Bockleman testified as to what she had observed concerning the black briefcase in late January 1973. As noted previously, Connie (on January 26) told Officer Driscoll that she had seen a black attache' case filled with plastic bags of white powder and some newspaper. In addition, she told the officer that while seated on horseback some 15 feet from the door of the house she had seen defendant leave the residence with a lidless cardboard box under his arm. Connie testified that while she did not see any plastic bags in the box, she thought she saw white powder in it similar to that which she had seen in the briefcase earlier that same day.

After hearing the testimony, the court denied defendant's motion to suppress and the case proceeded to trial on April 8, 1974. During the course of the trial, Detectives Driscoll and Andrews, Connie and Mrs. Bockleman, and Dixie Hardesty all testified substantially as they had on previous occasions. In addition, the following relevant testimony was produced at trial.

Constance Kehn, a neighbor of Dixie Hardesty, stated that some two to four weeks prior to the January 26 search of the Hardesty home she had seen at least one of the codefendants (whom she subsequently identified as Frank Mardian) bring a black attaché case to the house. She further testified that both defendant and Wyatt had been frequent visitors to the residence in early 1973.

Kenneth Donahue, who was acquainted with both defendant and Wyatt, testified that he accompanied Cliff Wyatt to the Hardesty house during January 1973 when Wyatt "picked up a couple ounces of PCP." Donahue stated that Wyatt had taken him to the house to show him where the PCP "stash" was located because Wyatt's partner, Mardian, was having trouble with his heroin habit and Wyatt wanted Donahue to replace Mardian in his PCP sales operation. (This testimony regarding Mardian was subsequently stricken on defendant's motion.) Donahue further testified that he and Wyatt delivered some of the PCP they picked up at the Hardesty house to a party in Yorba Linda, and that he (Donahue) took a portion of the contraband home with him that evening.

Debra Donahue, Kenneth's ex-wife, also testified on behalf of the prosecution. She stated (over defense objection) that in December 1972 or early January 1973 she was privy to a number of conversations between her ex-husband, Wyatt and the defendant, wherein the three discussed "different types of dope." During these discussions she testified that the parties suggested that "they had to go to Riverside to get it [the 'dope']" and that Cliff (Wyatt) "would send Frank [Mardian] to get it" at Cliff's sister's house.

Deputy Sheriff Harry Lesseos (of Los Angeles County) was called by the district attorney as an expert in the sale of PCP. Lesseos testified that PCP is a very strong drug, which can have hallucinogenic effects on humans (similar to LSD) when taken in very minute doses. He further stated that the average amount of pure PCP normally ingested to achieve a "high" was ten micrograms, and that if injected intravenously, a user could obtain the desired results with as little as two or three micrograms.

Following a 14-day trial, the jury returned a verdict finding defendant guilty of violation of section 11910 (possession of PCP) of the Health and Safety Code.

### SUFFICIENCY OF SEARCH WARRANT AND AFFIDAVIT

■ Defendant argues that the affidavit presented to the Riverside magistrate was constitutionally insufficient to justify issuance of a search warrant for the Hardesty residence. He contends that the citizen informants who provided the information set forth in Officer Driscoll's affidavit (Connie and Barbara Bockleman) had no personal knowledge of the facts alleged therein and that no averments regarding their reliability were set forth in the affidavit. Defendant concludes that said affidavit could not establish probable cause for the issuance of the warrant, and that all evidence seized pursuant to that warrant should have been suppressed by the courts below. With this argument we respectfully disagree.

To insure that a magistrate may make a complete probable cause determination, it must be ascertained that the affidavit accompanying the request for the issuance of a search warrant set forth *competent* facts. (*Skelton* v. *Superior Court,* 1 Cal.3d 144 [81 Cal.Rptr. 613, 460 P.2d 485].) ■ At a minimum the affidavit, on its face, must inform the magistrate of some of the underlying circumstances (1) from which the informant concluded that contraband was where he claimed it was, and

(2) from which the affiant (officer) concluded that the informant was credible, or his information reliable. (*Aguilar* v. *Texas,* 378 U.S. 108, 114-115 [12 L.Ed.2d 723, 728-729, 84 S.Ct. 1509]; *Spinelli* v. *United States,* 393 U.S. 410, 414-415 [21 L.Ed.2d 637, 642-643, 89 S.Ct. 584].) The California Supreme Court recently refined the first prong of the *Aguilar* test in *Alexander* v. *Superior Court,* 9 Cal.3d 387, 391 [107 Cal.Rptr. 483, 508 P.2d 1131]: a competent affidavit must set forth an informer's statement in factual—not conclusory—language, and it must establish that the informant spoke with personal knowledge of the subject matter of his statement.

While an affidavit may be based upon hearsay information which does not reflect observations of the affiant (*Aguilar* v. *Texas, supra,* 378 U.S. 108, 114), an informant's statement which consists of double hearsay must meet both prongs of the *Aguilar* test in regard to both hearsay assertions (e.g., the statements of both informant and declarant). (*Price* v. *Superior Court,* 1 Cal.3d 836, 841 [83 Cal.Rptr. 369, 463 P.2d 721].) However, where the declarant is or may be the subject of police inquiry and makes a statement potentially adverse to his interests, that statement, when reported by a reliable informant, satisfies both prongs of the *Aguilar* test. (*In re Jean M.,* 16 Cal.App.3d 96, 103-104 [93 Cal.Rptr. 679]; see also *Ming* v. *Superior Court,* 13 Cal.App.3d 206, 214 [91 Cal.Rptr. 477].)

In the present case, the following key facts were detailed in Driscoll's affidavit: Barbara Bockleman reported that Dixie Hardesty had admitted having narcotics in her home, and that Connie Bockleman had seen what appeared to be narcotics in, and being carried from, the Hardesty house on January 26; Connie Bockleman confirmed that she had seen "white powder" in a briefcase at the Hardesty residence, and that she had seen defendant carry white powder from the residence in a cardboard carton.

Initially, it must be noted that Dixie Hardesty's admission to Barbara Bockleman that contraband was secreted in her house meets *Aguilar* standards since Mrs. Hardesty thereby exposed herself to possible police investigation and criminal charges. (See *In re Jean M., supra,* 16 Cal.App.3d 96, 104.)[6] The factual averments of the affidavit satisfy the

---

[6]Defendant claims that the holding in *Price* v. *Superior Court, supra,* 1 Cal.3d 836, controls the present action. In *Price* an affidavit based upon information supplied by an unidentified, though reliable, informant was found wanting under *Aguilar.* But there the informant had relayed hearsay information to the police from unidentified citizen

first prong of the test. The underlying circumstances upon which the informants concluded that contraband was present in the Hardesty house are clearly set forth: Barbara Bockleman was told of its presence by Dixie Hardesty and her daughter, Connie, both of whom had personal knowledge of the contraband's presence inasmuch as they had observed it firsthand. The information supplied by the Bocklemans to the affiant consisted of more than mere conclusory statements; it consisted of facts sufficient to permit the magistrate to make an independent judgment as to probable cause. Thus, it must only be established that the hearsay statements of the Bocklemans set forth in the affidavit were those of *reliable* informants (the second prong of the test) in order to find issuance of the warrant constitutionally sufficient within *Aguilar* parameters.

While earlier cases held citizen informants to be inherently reliable (primarily because they had exposed themselves to potential liability for malicious prosecution)—and mere averment to their "citizen" status sufficient to satisfy the *Aguilar* rule (see *People* v. *Guidry,* 262 Cal.App.2d 495, 497-498 [68 Cal.Rptr. 794]; *People* v. *Griffin,* 250 Cal.App.2d 545, 550-551 [58 Cal.Rptr. 707]; *People* v. *Lewis,* 240 Cal.App.2d 546, 550 [49 Cal.Rptr. 579])—more recent decisions have held that the "label 'citizen-informer' does not eliminate the necessity of the People establishing *to some degree* that the information obtained was reliable." (*People* v. *Herdan,* 42 Cal.App.3d 300, 305-306 [116 Cal.Rptr. 641]; see also *People* v. *Balassy,* 30 Cal.App.3d 614, 621 [106 Cal.Rptr. 461].) But the Supreme Court has noted that the demonstration of reliability required in the case of the citizen informant is not as rigorous as that required in the case of the unidentified (and often paid) informant: either the details of the citizen informant's information (the internal trustworthiness of the statement itself), the good character or reputation of the informer, *or* evidence of prior experience in identifying contraband can suffice to establish a citizen informant's reliability. (*Krauss* v. *Superior Court,* 5 Cal.3d 418, 421-422 [96 Cal.Rptr. 455, 487 P.2d 1023]; *Ming* v. *Superior Court, supra,* 13 Cal.App.3d 206, 213; see also *People* v. *Scoma,* 71 Cal.2d 332, 339 [78 Cal.Rptr. 491, 455 P.2d 419].) Further, it has recently been suggested that a previously untested citizen informant's information is presumptively reliable when his statements are based upon his personal observations of the commission of a crime. (*People* v. *Hill,* 12 Cal.3d 731, 761 [117 Cal.Rptr. 393, 528 P.2d 1].)

declarants whose reliability had not been established, and it did not appear that the declarants' statements were based upon personal observations. In the instant case, the credibility of Mrs. Bockleman's sources (Dixie and Connie) is not so attenuated. Hence, *Price* is of little guidance in assessing the competency of the affidavit here in issue.

In the instant case, we have an affidavit which sets forth facts supplied by two citizen informants: Mrs. Bockleman's statement that Dixie Hardesty admitted having stored narcotics at her residence; and Connie's statement that she observed a white powder, packed in plastic bags, in a black briefcase hidden in a bedroom closet at the Hardesty house. The reliability of Mrs. Bockleman's statement may be ascertained both from its detail and from the circumstances under which it was made. First, she informed Officer Driscoll not only of her belief that narcotics were secreted in the Hardesty home, but indicated what types of narcotics might be found there; the container in which they were stored; and the name of the individual who allegedly brought the drugs to the Glen Avon address. Such details would permit the magistrate to draw the reasonable conclusion that Barbara Bockleman's report was of real substance and that she, in turn, was reliable. Second, and more importantly, the fact that Mrs. Bockleman was the mother of a young girl who babysat at the Hardesty residence is good reason to find her report credible: it is reasonable to conclude that she was concerned for the welfare of her daughter; did not want her present in a home where drugs were stored or trafficked; and as a result notified police of her belief that contraband was present at the Hardesty residence. Thus, the circumstances of the mother's report lend it credibility.

Likewise, the details of Connie's statement (and her description of the defendant's activity at the Hardesty house) make her "reliable" under the *Aguilar* formula. In addition, Connie was, arguably, a witness to the commission of a crime (defendant's possession of PCP in the cardboard box) and in reporting that crime became presumptively reliable.

The second prong of *Aguilar* having been met, it cannot be said that the affidavit was constitutionally infirm.[7]

It should be noted, as well, that no error may be charged in the magistrate's probable cause determination based upon the affidavit. ▮ In determining the sufficiency of an affidavit, the test to be applied by the magistrate is whether the facts contained therein are such as would lead a man of ordinary caution and prudence to believe and

---

[7]Defendant argues that "*Aguilar*-deficient informants cannot be piled together to create one satisfactory informant." Herein we have two citizen informants who are both "*Aguilar*-sufficient;" both provided police with detailed factual statements as to why they believed contraband was present in the Hardesty residence, and their statements were set forth in full in the affidavit authored by Deputy Sheriff Driscoll. *Aguilar* demands no more.

consciously entertain a strong suspicion that contraband is present in the place to be searched. (*Skelton* v. *Superior Court, supra,* 1 Cal.3d 144, 150.) Further, the probable cause determination of the magistrate must be sustained on appeal if there is a "substantial basis" for his determination. (*Ibid.,* p. 153.) In the present case, the magistrate was informed that a resident of the house to be searched had admitted possession of narcotics, and that a citizen informant had apparently seen those drugs on the premises. These facts constitute a "substantial basis" for the magistrate's probable cause finding, and the warrant subsequently issued was constitutionally sufficient.

 Defendant also argues that insufficient averments appear on the face of the affidavit to justify the magistrate's authorization of a nighttime search.[8] The warrant provided that the executing officer might "serve this warrant at any time of day or night." Service was had at approximately 11:25 p.m.

In his argument, defendant makes two contentions with which we must agree: (1) a magistrate cannot make a neutral and independent determination of whether authorization of nighttime service is necessary when faced with only conclusory and ambiguous allegations in the affidavit; and (2) an affiant's averment that in his experience (generally) particular types of contraband are easily disposed of does not, in itself, constitute a sufficient showing for the necessity of a nighttime search: a particular and specific reason for nighttime service must be set forth.[9] But to find these two propositions dispositive of defendant's argument, we would be forced to make two assumptions contrary to the record before us: (1) that all the averments regarding the necessity of nighttime service were merely conclusory; and (2) that the only showing of necessity made in the affidavit was the affiant's suggestion that narcotic contraband is, generally, easily and rapidly disposed of.

[8]Section 1533 of the Penal Code provides: "Upon a showing of good cause, the magistrate may, in his discretion, insert a direction in a search warrant that it may be served at any time of the day or night. In the absence of such a direction, the warrant shall be served only between the hours of 7:00 o'clock a.m. and 10:00 o'clock p.m."

[9]Defendant gleaned this proposition, by way of analogy, from *People* v. *De Santiago,* 71 Cal.2d 18 [76 Cal.Rptr. 809, 453 P.2d 353], wherein defendant's conviction was overturned because authorities failed to comply with the "knock and notice" provisions of Penal Code section 844 (relating to arrest). The court indicated that an invasion of a citizen's home and intrusion upon his privacy by failing to comply with the statute could be justified if and only if police possessed specific, articulable facts which would justify non-compliance. This rule seems to be appropriate in reviewing the sufficiency of the showing made for noncompliance with section 1533 of the Penal Code, since both sections 1533 and 844 focus upon substantially the same privacy interests of the citizens concerned.

■ At the outset it should be noted that section 1533 does not require a separate statement as to good cause for the serving of a warrant in the nighttime (*People* v. *Walker,* 250 Cal.App.2d 214, 219 [58 Cal.Rptr. 495]): if the affidavit, read in a common sense manner and as a whole reasonably supports the inference that the interests of justice are best served by the authorization of nighttime service, provision for such service in the warrant is proper. (Cf. *People* v. *Scoma, supra,* 71 Cal.2d 332, 340.) ■ Absent an abuse of discretion, the magistrate's finding of a reasonable necessity of nighttime service will not be disturbed on appeal. (*Solis* v. *Superior Court,* 63 Cal.2d 774, 776-777 [48 Cal.Rptr. 169, 408 P.2d 945]; *People* v. *Walker, supra,* 250 Cal.App.2d 214, 219-220.)

■ The affiant herein (Officer Driscoll) made a separate statement regarding the necessity of nighttime service: he knew the contraband to be of a type which is normally held for short periods of time, and he knew that both adult residents of the Glen Avon dwelling would have an opportunity to remove said contraband soon in that they were leaving the premises at 6 a.m. the following morning. In addition, he had information that the contraband stored on the premises was in the process of being taken elsewhere inasmuch as defendant had been seen carrying a box filled with white powder from the house on the afternoon of January 26. Mrs. Bockleman's initial report was received by the sheriff's department on January 26. Officer Driscoll commenced investigation immediately, and upon verifying for himself that it was likely that contraband was secreted in the Hardesty residence began to draft the affidavit prerequisite to the securing of a search warrant for the suspect premises. Driscoll then proceeded forthwith to a magistrate who issued the requested warrant—at 10:40 p.m. on January 26.

It could reasonably be concluded from the facts stated in the affidavit that (1) contraband was probably still present on the premises, (2) it was in the process of being removed, and (3) the Hardestys would have an opportunity to remove the remainder of the contraband at 6 a.m. the following morning—before a warrant could be served. Where, as here, an affiant's general knowledge concerning the disposability of narcotics is coupled with specific facts which lend themselves to the reasonable inference that contraband is soon to be removed from premises to be searched, sufficient facts are presented to justify the magistrate's authorization of a nighttime search. (Cf. *Galena* v. *Municipal Court,* 237 Cal.App.2d 581, 591-592 [47 Cal.Rptr. 88].) Under the circumstances, the magistrate did not abuse his discretion inasmuch as good cause existed for nighttime service of the search warrant.

Next defendant contends that he was illegally committed by the magistrate at the preliminary hearing (July 27, 1973). He claims that he was denied a substantial right at that hearing because he was prohibited from demonstrating that Driscoll's affidavit contained factual misstatements and, consequently, could not provide probable cause for issuance of the search warrant for the Hardesty residence.

On the first day of the preliminary proceeding (June 22, 1973) defendant noticed a motion to suppress evidence (Pen. Code, § 1538.5). The June 22 hearing was devoted to a determination of the sufficiency of the affidavit "on its face." The preliminary hearing was continued until July 27 and on that day defendant attempted to show that factual misstatements were present in the affidavit which invalidated the search warrant. Defendant's counsel made an offer of proof to the magistrate which included claims that (1) Connie Bockleman did not, contrary to the averment in the affidavit, see "Frank" open the suitcase and remove contraband, and (2) that the affidavit did not contain all facts relevant and known to the affiant on the issue of probable cause. Following this offer of proof the magistrate declined to permit defendant to call witnesses on the issue, and found the affidavit and warrant sufficient.

Defendant is correct in stating that when one is denied a substantive right at his preliminary hearing, his commitment thereupon becomes illegal and he is entitled to dismissal of the charges against him. (*Jennings* v. *Superior Court,* 66 Cal.2d 867, 874 [59 Cal.Rptr. 440, 428 P.2d 304].) However, he overstates the precedent holdings of courts of this state when he asserts that a magistrate's refusal to conduct a full hearing on a motion to suppress evidence at a preliminary hearing constitutes, per se, a denial of a substantive right requiring dismissal.[10]

---

[10]Defendant relies upon .two cases for this proposition. In the first, *Theodor* v. *Superior Court,* 8 Cal.3d 77 [104 Cal.Rptr. 226, 501 P.2d 234], defendant was denied the opportunity to inquire into the truth of the facts asserted in an affidavit at a.combined preliminary and (Pen. Code) 1538.5 hearing. The court held that a defendant was entitled to show that misstatements of fact in an affidavit invalidated a warrant for lack of probable cause. The court found error in the proceedings below insofar as the defendant was not permitted to challenge the factual accuracy of the affidavit. In the second case, *People* v. *Sanchez,* 24 Cal.App.3d 664 [101 Cal.Rptr. 193], the defendant was not permitted to attack the factual accuracy of an affidavit at a 1538.5 hearing, nor was he permitted to raise this argument at a subsequent preliminary hearing. Both cases are distinguishable from the instant action.

In both *Theodor* and *Sanchez* the defendant was never permitted to challenge the factual accuracy of an affidavit. Herein, defendant was permitted, subsequent to the preliminary hearing, a full hearing on this very issue (Mar. 3, 1974). (See discussion, *infra.*)

Rather than standing for the proposition that defendant asserts (e.g., the right to a full

■ While a defendant may properly challenge the sufficiency of a search warrant (affidavit) with a motion to suppress evidence (Pen. Code, § 1538.5) or a motion to dismiss (Pen. Code, § 995) (*People* v. *Superior Court (Kusano)* 276 Cal.App.2d 581, 584-585 [81 Cal.Rptr. 42]), he is normally only entitled to *one* complete hearing on the suppression issue (either before the issuing magistrate, at the preliminary hearing or in superior court). (*People* v. *Sanchez, supra,* 24 Cal.App.3d 664, 689.) Any errors made by a magistrate at a preliminary hearing in failing to fully consider a defendant's motion to suppress evidence may be *cured* by a subsequent, correct determination of the issue in the superior court. (*People* v. *Sanchez, supra,* 24 Cal.App.3d 664, 689; *People* v. *Neal,* 53 Cal.App.2d 379, 383 [127 P.2d 996], cited with approval in *Jennings* v. *Superior Court, supra,* 66 Cal.2d 867, 880-881.)

■ Whatever error may have been committed by the magistrate in refusing to receive evidence on the issue of the affidavit's accuracy at the preliminary hearing was cured by the superior court's correct determination of that issue in a full 1538.5 hearing on March 3, 1974. At that hearing testimony was taken from Barbara and Connie Bockleman regarding the information they had conveyed to Officer Driscoll (the affiant in this case), who was himself examined.

■ Three questions must be asked when the accuracy of an affidavit is challenged: (1) does it contain factual misstatements? (2) if so, are these misstatements material? and (3) if material, did the affiant act reasonably in believing those misstatements to be true when he set forth the averments of his affidavit? (*Theodor* v. *Superior Court, supra,* 8 Cal.3d 77, 96-97.) The test upon review is whether the affidavit contains sufficient competent evidence to lead a reasonably prudent man to believe there is a basis for the issuance of a search warrant. (*Halpin* v. *Superior Court,* 6 Cal.3d 885, 895 [101 Cal.Rptr. 375, 495 P.2d 1295], cert. den., 409 U.S. 982 [34 L.Ed.2d 246, 93 S.Ct. 318].)

■ The only significant misstatement which arguably emerged at the March hearing was whether Connie Bockleman stated that she actually saw defendant "get into," and remove contraband from, the black briefcase. This arguably inaccurate averment was not material: whether or not defendant actually removed contraband from the house

---

hearing of a challenge to an affidavit's accuracy at the preliminary hearing), it is more accurate to summarize these cases as holding that a defendant is entitled, when moving to suppress evidence, to challenge the factual accuracy of the affidavit underlying a search warrant *at some stage* in the proceedings.

had little bearing on the magistrate's determination of whether narcotics were on the premises, and the accurate averments of the affidavit were sufficient to establish probable cause for issuance of the warrant.

The superior court's hearing on, and correct determination of, the affidavit's accuracy cured whatever error may have occurred at the preliminary hearing.

### SUFFICIENT CAUSE TO BIND OVER

Penal Code sections 871 and 872 require that *"sufficient cause* to believe the defendant guilty of a public offense" be presented to a magistrate at a preliminary hearing before the accused may be bound over for trial. ▆ Defendant contends that sufficient cause was not demonstrated at his preliminary hearing and that, therefore, his motion to dismiss pursuant to section 995 of the Penal Code was improperly denied on December 7, 1973.[11]

▆ "Sufficient cause" within sections 871 and 872 has substantially the same meaning as does "reasonable or probable cause" in a Fourth Amendment context: such a state of facts as would lead a man of ordinary caution and prudence to believe, and consciously entertain, a strong suspicion of the guilt of the accused. (*Williams* v. *Superior Court,* 71 Cal.2d 1144, 1147 [80 Cal.Rptr. 747, 81 Cal.Rptr. 761, 458 P.2d 987].) Such facts need not be enough to support a conviction, and an information may not be set aside if there exists some rational ground for assuming the possibility that an offense has been committed and that the defendant is guilty of it. (*Ibid.,* pp. 1147-1148.) ▆ The burden, of course, rests upon the prosecution to show sufficient cause. (*Garabedian* v. *Superior Court,* 59 Cal.2d 124, 126-127 [28 Cal.Rptr. 318, 378 P.2d 590].) Consequently, on review, every legitimate inference which can be drawn in favor of the information must be; and if the appellate court finds *some* evidence to support the commitment, it cannot inquire into the sufficiency of that evidence. (*Rideout* v. *Superior Court,* 67 Cal.2d 471, 474 [62 Cal.Rptr. 581, 432 P.2d 197].) However, some evidence must

---

[11]The Attorney General argues that since defendant has failed to provide this court with a transcript of the December 7 hearing, he "may not raise this issue on appeal." But defendant is required only to present a record which discloses the error complained of (*People* v. *Siegenthaler,* 7 Cal.3d 465, 469 [103 Cal.Rptr. 243, 499 P.2d 499]; *Weiss* v. *Brentwood Sav. & Loan Assn.,* 4 Cal.App.3d 738, 746 [84 Cal.Rptr. 736])—and the alleged error (e.g., insufficient cause to bind over) occurred at the preliminary hearing of July 27—of which a transcript has been provided. Hence, the Attorney General's argument is without merit.

be presented at the preliminary hearing regarding each element of the crime of which a defendant is accused—though the existence of each element may be inferred from circumstantial evidence. (*Williams* v. *Superior Court, supra,* 71 Cal.2d 1144, 1148; *People* v. *Estrada,* 234 Cal.App.2d 136, 155 [44 Cal.Rptr. 165, 11 A.L.R.3d 1307].)

■ Defendant was held to answer for the crime of possession of a controlled substance. The crime has three elements: (1) the accused must possess knowledge of the contraband's narcotic character and (2) its presence; and (3) he must exercise dominion and control over it. (*Rideout* v. *Superior Court, supra,* 67 Cal.2d 471, 474-475; *People* v. *Estrada, supra,* 234 Cal.App.2d 136, 155.) ■ Defendant claims that the state failed to produce evidence showing that he had dominion and control over the seized contraband and, consequently, his commitment lacked sufficient cause. A review of the record of the preliminary hearing does not support defendant's claim.

At the July 27 hearing Dixie Hardesty testified that defendant and her brother (Wyatt) had brought the briefcase (found to contain PCP) to her home for "safekeeping" in mid-January 1973. Defendant returned to the Hardesty home a dozen times and went directly to the cubbyhole where the attache' case was hidden. Subsequently, Wyatt (unaccompanied by Mardian) moved the briefcase to a bedroom closet. Yet, when defendant next came to the Hardesty house, he went immediately to the new hiding place without direction from Mrs. Hardesty.

This circumstantial evidence lends itself to the reasonable inference that defendant had dominion and control (though apparently not exclusive)[12] over the briefcase in question and its contents. (Compare *People* v. *Redrick,* 55 Cal.2d 282, 288-289 [10 Cal.Rptr. 823, 359 P.2d 255], wherein the court found that defendant's possession and unexplained loss of a key to a closet where contraband was secreted was sufficient circumstantial evidence to justify the inference that he knew of the presence of contraband.) While proof of "mere access" to contraband is insufficient to establish dominion (*Hacker* v. *Superior Court,* 268 Cal.App.2d 387 [73 Cal.Rptr. 907]; *People* v. *Estrada, supra,* 234 Cal.App.2d 136), Mrs. Hardesty's testimony revealed far more than mere access to the briefcase.

---

[12]Exclusive physical possession or dominion is not a requisite element of the crime charged. (*People* v. *Estrada, supra,* 234 Cal.App.2d 136, 155.)

Defendant had sufficient dominion over the briefcase so that he was constantly apprised of its hiding place—which he frequently visited. Defendant's argument that the state failed to show dominion or control of the PCP seized must be rejected. His motion to set aside the information pursuant to Penal Code section 995 was properly denied by the trial court.

## CONFRONTATION OF WITNESSES

Kenneth Donahue, an acquaintance of both defendant and Cliff Wyatt, appeared as a witness at trial. On cross-examination defense counsel asked Donahue to state his current address, and the prosecution interposed an objection to that request which was sustained by the trial court. Defendant now contends that this was a rudimentary inquiry regarding the credibility of the witness and that the action of the trial court effectively emasculated his Sixth Amendment right to confront and cross-examine this witness against him. We disagree.

While the Supreme Court has held that prejudice may result when a defendant is forbidden from asking a witness his current address (*Smith* v. *Illinois*, 390 U.S. 129 [19 L.Ed.2d 956, 88 S.Ct. 748]; *Alford* v. *United States*, 282 U.S. 687 [75 L.Ed. 624, 51 S.Ct. 218]) prejudice does not always or necessarily result. In *Alford* the court reasoned that "[p]rejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them." (P. 693 [75 L.Ed. p. 628].)

Thus, the Sixth Amendment requires, at a minimum, that a prosecution witness' testimony be placed in proper perspective, and to the extent that a witness' address may aid in properly placing this testimony, it is a constitutionally protected subject of cross-examination—but the Sixth Amendment does not accord a defendant a right to demand to know the address of each and every prosecution witness. (*United States* v. *McKinley*, 493 F.2d 547, 550-551.) And federal courts have held that denial of defense inquiry into a witness' address is not error where defense counsel has already clearly placed that witness "in his proper setting." (*United States* v. *Alston*, 460 F.2d 48, 52, cert. den., 409 U.S. 871 [34 L.Ed.2d 122, 93 S.Ct. 200]; *United States* v. *Daddano*, 432 F.2d 1119, 1128, cert. den., 402 U.S. 905 [28 L.Ed.2d 645, 91 S.Ct. 1366]; see also *United States* v. *Penick*, 496 F.2d 1105, 1108, cert. den., 419 U.S. 897 [42 L.Ed.2d 141, 95 S.Ct. 177].)

In the case at hand, defense counsel placed Kenneth Donahue in his proper setting without resort to inquiry regarding his current address: on cross-examination counsel established that the witness had been granted immunity; used drugs; was a convicted felon; had sold narcotics; possessed an illegal weapon; and was working as a police informer. Such information gave the jury sufficient environmental background regarding this witness to accurately weigh and assess his testimony.

Hence, defendant was not denied his Sixth Amendment right to effectively cross-examine this witness against him.[13]

■ Next defendant contends that his Sixth Amendment right of confrontation was denied him when Debra Donahue was permitted to testify about conversations she overheard between her ex-husband (Kenneth Donahue), Cliff Wyatt and the defendant, inasmuch as Wyatt did not testify at trial. Defendant, in addition, argues that testimony delivered by Kenneth Donahue regarding conversations he (Donahue) had had with Wyatt concerning the sale of narcotics prejudiced his case.[14]

In his argument defendant refers the court to two landmark decisions in criminal procedure—*Bruton* v. *United States,* 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620] and *People* v. *Aranda,* 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265]—and in so doing treats the conversations related by Debra and Kenneth Donahue as if they had been full confessions given to police officers. But such is not the case.

Both the *Aranda* and *Bruton* rules were narrowly drawn and the opinions carefully focused: it was held that when the *confession* of a codefendant (who does not testify) is admitted at a joint trial, the prejudice which will befall the other codefendant cannot be dispelled merely by giving a limiting instruction.

But in the instant case we are not concerned with the admission into evidence of anything so concrete and undeniably prejudicial as the

[13]Defendant also argues, inferentially, that he needed Donahue's address to conduct an investigation prior to trial. But this contention is frivolous in light of the fact that defense counsel questioned the witness at his home sometime before trial.

[14]Defendant contends, as well, that Donahue gave hearsay testimony in which he linked defendant to a drug sales scheme, and also indicated that defendant was a drug addict. But a careful reading of the record reveals that the trial court, on a subsequent motion by defense counsel, struck all of Donahue's testimony concerning the defendant. Thus, defendant's argument in this regard is without merit.

confession of a codefendant. Rather, the court admitted statements of both defendant and codefendant overheard by Debra Donahue, and participated in by Kenneth Donahue, which were admissible under the admissions exception to the hearsay rule. (Evid. Code, § 1220.) Defendant offers no reason to extend *Aranda* and *Bruton* prohibitions to cover the myriad cases where admissions of a codefendant are admitted into evidence, and we can think of none. Thus, defendant's argument that the testimony of Debra and Kenneth Donahue was erroneously admitted into evidence must be rejected.

## CORROBORATION

■ Defendant contends that the only evidence that the prosecution presented at trial which implicated him in the crime of possession of a controlled substance came from the testimony of two accomplices, Dixie Hardesty and Kenneth Donahue. Penal Code section 1111 prohibits conviction of an accused based upon the testimony of any accomplice "unless it be corroborated by such other [independent] evidence as shall tend to connect defendant with the commission of the offense," and defendant claims that the corroboration required by the code was lacking in this case. Again we must disagree.[15]

■ To corroborate the testimony of an accomplice, the prosecution must present independent evidence which, without aid or direction from the testimony of the accomplice, tends reasonably to connect the defendant with the commission of the crime charged. (*People* v. *Perry,* 7 Cal.3d 756, 769 [103 Cal.Rptr. 161, 499 P.2d 129].) Corroborating evidence is insufficient if it does no more than cast a "grave suspicion" upon the accused, or merely connects him with the crime's perpetrators. (*People* v. *Robinson,* 61 Cal.2d 373, 399-400 [38 Cal.Rptr. 890, 392 P.2d 970].) ■ While the corroborating evidence need not support every fact to which the accomplice has testified, it must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime. (*People* v. *Hathcock,* 8 Cal.3d 599, 617 [105 Cal.Rptr. 540, 504 P.2d 476]; *People* v. *Perry, supra,* 7 Cal.3d 756, 769.)

But corroborative evidence need not in itself establish every element of the crime (*People* v. *Hathcock, supra,* 8 Cal.3d 599, 617); it is sufficient if it tends to connect the defendant with the commission of a crime in such a way as may reasonably satisfy the jury that the accomplice to be

---

[15]It should be noted that the corroboration of an accomplice required by section 1111 cannot be supplied by the testimony of another accomplice. (See Fricke & Alarcon, Cal. Criminal Law (9th ed. 1965) p. 111; CALJIC (1970) No. 3.31, p. 79.)

corroborated is telling the truth. (*People* v. *Hathcock, supra,* 8 Cal.3d 599, 617; *People* v. *Thurman,* 28 Cal.App.3d 725, 729 [104 Cal.Rptr. 804].) The requisite corroboration may be provided entirely by circumstantial evidence, the conduct of the defendant or his declarations to other persons; the corroborative evidence may well be slight and entitled to little consideration when standing alone. (*People* v. *Fujita,* 43 Cal.App.3d 454, 470 [117 Cal.Rptr. 757].)

 Adequate corroborative evidence was produced by the prosecution in this case to satisfy the requirements of section 1111.

The Attorney General suggests that the testimony of Mrs. Kehn—who saw defendant carry a black attaché case into the Hardesty residence in January 1973—is corroborative of Mrs. Hardesty's testimony. But the activity observed by Mrs. Kehn was, on the surface, as consistent with totally innocent behavior on the defendant's part as it was with the alleged criminal act. This testimony requires aid from Dixie Hardesty's testimony to link the defendant to the commission of a crime (possession of PCP) and is, hence, insufficiently corroborative to satisfy the code section. However, the testimony of two other witnesses—Connie Bockleman and Debra Donahue—did provide sufficient corroboration to convict defendant of the crime charged.

Though Connie's testimony at trial was somewhat equivocal,[16] taken as a whole it lent itself to the following interpretation by the jury: while babysitting at the Hardesty home, Connie had occasion to view the contents of a black attaché case; therein she saw plastic bags packed with white powder. On January 26, while in the front yard of the Hardesty residence, she saw defendant leave the house carrying a lidless cardboard box which appeared to contain the same white powder she had observed earlier in the briefcase. Subsequent chemical analysis revealed that the aforesaid attaché case contained PCP. Thus Connie Bockleman, who saw defendant in possession of contraband, provided

---

[16]At trial Connie was asked whether she actually saw anything in the box that she observed defendant carry from the Hardesty house, and she responded, "I don't know." Later, in response to the same inquiry from defense counsel she said, "Like I told you, I don't remember if I saw it [the contraband] or if I just thought I saw it." Barbara Bockleman, Connie's mother, then took the stand and stated that on January 26, 1973 (some 16 months before trial) Connie had told her that she had seen defendant leave the Hardesty house carrying a cardboard box in which "she saw the same thing . . . that she saw in the suitcase in the house." (This statement was admissible under the prior inconsistent statement exception to the hearsay rule, *People* v. *Cannady,* 8 Cal.3d 379, 386-387 [105 Cal.Rptr. 129, 503 P.2d 585].) Faced with this testimony, the trier of fact could reasonably conclude that Connie saw defendant remove contraband from the house, and such a conclusion constitutes substantial evidence.

the independent evidence which tended to connect defendant with commission of a crime, and in so doing corroborated the accomplices' testimony heard at trial.

In addition, Debra Donahue's testimony to the effect that her ex-husband, Wyatt, and the defendant had in her presence discussed sales of PCP, which was stored at the Hardesty house and which defendant was to pick up, provides further independent evidence which could reasonably satisfy the jury that the accomplices herein were telling the truth. This testimony was likewise sufficiently corroborative to satisfy Penal Code section 1111.

Thus, defendant's contention that insufficient corroboration was had of accomplice testimony to find him guilty of possession of a controlled substance must be rejected.[17]

## Jury Instructions

First, defendant contends that the trial court erred in removing from the jury the determination of whether the powder seized contained sufficient PCP to be usable as a drug by giving CALJIC instruction Nos. 12.31 and 12.33.[18] This argument, in turn, breaks down into two key questions: (1) did the court in fact remove the determination of "a usable quantity" from the jury; and (2) was evidence produced indicating that the powder seized contained sufficient PCP to produce a narcotic effect?

The answer to the first question posed is easily ascertained in reading *all* the jury instructions in this case. The trial court gave CALJIC instruction No. 12.20.5 to the jury in addition to the two aforementioned instructions. This instruction, in relevant part, reads: "To constitute illegal possession for sale of a restricted dangerous drug, it must be

---

[17]Defendant also contends that his motion for acquittal for failure of the prosecution to present sufficient evidence to sustain a conviction (Pen. Code, § 1118.1) was improperly denied. (See *People* v. *Ricketts,* 7 Cal.App.3d 441 [86 Cal.Rptr. 647].) He argues that at the close of the prosecution's case, no testimony corroborative of that of accomplices Dixie Hardesty and Kenneth Donahue had been introduced. This contention lacks merit, however, in light of the fact that the Bocklemans had provided sufficient corroborative testimony during the prosecution's case in chief to sustain defendant's conviction.

[18]CALJIC No. 12.31 states that proof that the amount of a drug possessed is "usable" may be established by expert testimony or by evidence that the amount possessed was sufficient to be used "in any manner customarily employed."

CALJIC No. 12.33 states that to prove "usable" quantity the state need not show that the drug would necessarily produce a narcotic effect or that the proscribed ingredient in the drug was capable of producing a narcotic effect.

established . . . that the substance was sufficient in an amount to be used as a drug." The trial court could not have more clearly indicated to the jury that it was to determine whether the powder seized contained sufficient PCP to be "usable" as a drug. In fact, CALJIC No. 12.20 (identical to the aforestated instruction but for the words "for sale") has been held sufficient to instruct the jury that it is to determine the issue of "usable quantity." (*People* v. *Schenk,* 24 Cal.App.3d 233, 237 [101 Cal.Rptr. 75].)

In addition, the jury's determination that defendant in fact possessed a usable quantity of PCP is well supported by the record. While possession of a controlled substance with a narcotic potential is required under the statute (e.g., minute amounts of a substance which are not usable for consumption are not sufficient evidence to justify conviction) (*People* v. *Leal,* 64 Cal.2d 504 [50 Cal.Rptr. 777, 413 P.2d 665]; *People* v. *Johnson,* 5 Cal.App.3d 844 [85 Cal.Rptr. 238]), the prosecution need not show that the quantity possessed is capable of producing a narcotic effect on the user. (*People* v. *Schenk, supra,* 24 Cal.App.3d 233.) To convict a defendant of possession of a controlled substance, it must be shown that he possessed a drug with narcotic potential—to insure that the inference (implicit in conviction) that the defendant intended in some way to use the drug for illicit purposes has been reasonably drawn by the trier of fact.

The jury was informed herein that defendant possessed a powder compound of 384 grams, some part of which was PCP. They received expert testimony that 10 micrograms (a minute amount) of PCP would produce a narcotic effect. It was reasonable to infer from this evidence that the powder possessed was "usable," in some way, under the aforestated rules. Hence, the jury's determination is supported by substantial evidence.[19]

 Finally, defendant complains that the trial court erred in refusing to give 13 of his requested instructions. Seven of defendant's

---

[19]It strikes this court as a bit odd that defendant would advance the foregoing argument in light of the following facts: at the preliminary hearing the state's chemist indicated that the 384-gram compound contained *at least* 1 percent PCP (otherwise his tests would not have revealed its presence). Thus, we can assume that defendant possessed at least 3.84 grams of pure PCP. At trial an expert testified that 10 micrograms of PCP induced a "high." A microgram is one-millionth of a gram. Thus, defendant was in possession of 384,000 "hits" of PCP. Assuming defendant took one dose of the drug per day, he could stay "high" for in excess of a millenium. It is a bit puzzling, under these circumstances, that the jury failed to convict defendant of the crime charged—possession for sale.

requested instructions related to the necessity of corroboration required for the testimony of an accomplice; three requested instructions stated that to find the defendant possessed the drug in question, more than mere access (or proximity) must be shown; and one directed that eyewitness testimony be viewed with caution. The two remaining requests were for special findings of fact by the jury to determine whether or not they believed that Connie Bockleman saw "white powder" in the cardboard box the defendant carried from the Hardesty house. All of these requests were properly denied by the trial court.

A judge may select appropriate instructions from those submitted by the parties, with or without modification, or may use his own instructions. (*Harris* v. *Belton*, 258 Cal.App.2d 595, 615 [65 Cal.Rptr. 808]; 4 Witkin, Cal. Procedure (2d ed. 1971) § 193, p. 3013.) Each of the essential elements of a given case must be covered completely by the instructions given (*Harris* v. *Belton, supra*, 258 Cal.App.2d 595, 615; see also *People* v. *Carter*, 192 Cal.App.2d 648, 662-663 [13 Cal.Rptr. 541]), and it is a fundamental rule that all of the instructions must be read together (*Douglas* v. *Southern Pacific Co.*, 203 Cal. 390, 396 [264 P. 237]; 4 Witkin, Cal. Procedure (2d ed. 1971) § 244, pp. 3057-3058): " 'Whether a jury has been correctly instructed is not to be determined from a consideration of parts of an instruction or from particular instructions, but from the entire charge of the court.' " (*People* v. *Rhodes*, 21 Cal.App.3d 10, 20 [98 Cal.Rptr. 249], quoting from *People* v. *Monteverde*, 111 Cal.App.2d 156, 168 [244 P.2d 447].) On review, reversible error in the instruction of the jury may be found if and only if it affirmatively appears that the error was likely to have misled the jury. (*People* ex rel. *Dept. of Public Works* v. *Wasserman*, 240 Cal.App.2d 716, 741 [50 Cal.Rptr. 95]; 4 Witkin, Cal. Procedure (2d ed. 1971) § 242, pp. 3056-3057.)

Thus, to determine whether or not the 11 requested jury instructions were properly refused we must review the entire charge to the jury. The court instructed the jury extensively on the issue of corroboration of an accomplice's testimony. The jury was told that corroboration must be had from other evidence which tends to connect the defendant with the commission of the crime charged; that the corroborative evidence is insufficient if it requires direction from an accomplice's testimony; that the corroborative evidence is insufficient if it merely casts suspicion on the accused; and that such evidence must relate to some act of the offense charged. These instructions fully apprised the jury of the requirements of sufficient corroborative evidence. (See discussion, *infra.*) Defendant has no right to have "his"

instructions given and, hence, no error can be found in regard to the trial court's instructions on the issue of corroboration.

Likewise, the court adequately instructed the jury on the question of whether defendant had actual possession of the contraband (e.g., dominion). The court stated that neither mere proximity to the drug, nor association with those in possession, was sufficient to establish possession under the law. (The three instructions requested by defendant stated that dominion could not be shown by mere access or proximity to the contraband, and were effectively covered by the foregoing instruction.) Defendant's requested instruction that eyewitness testimony be viewed with caution was adequately covered by the court's reading of CALJIC No. 2.20 (regarding evaluation of witness' testimony). Thus, no error may be found in the court's refusal to use defendant's proffered jury instructions.

Lastly, we reach defendant's contention that the court erred in refusing to instruct the jury to render two special findings. Again, no error may be attributed to the trial court.

Penal Code section 1150 states that "The jury *must* render a general verdict, except . . . when they are in doubt as to the legal effect of the facts proved, they *may,* . . . find a special verdict." (Italics added.) The power to bring in a special verdict (or special findings of fact) is optional with the jury (*People* v. *Rhone,* 267 Cal.App.2d 652, 659-660 [73 Cal.Rptr. 463]; *People* v. *Allen,* 47 Cal.App.2d 735, 748 [118 P.2d 927]). However, the court, upon request of either party to a criminal proceeding, should direct the jury that they have discretion to bring in a special verdict (findings) (*People* v. *Antonio,* 27 Cal. 404, 407-408), provided that the form of the party's request for special findings of fact makes it clear that such findings are within the jury's *absolute discretion.* (*People* v. *Perry, supra,* 7 Cal.3d 756, 783-784.) Defendant's proffered special findings were directory, and failed to indicate that such findings were within the jury's discretion. Thus, the trial judge properly refused defendant's request for said findings. (*Ibid.,* p. 784.)

The judgment of conviction is affirmed.

Gardner, P. J., and Tamura, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 3, 1975.